**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 13-4803

_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

BACH TUYET TRAN, a/k/a Julie Tran, a/k/a J. Bach, a/k/a Bach
T. Tran, a/k/a J. Tran,

Defendant – Appellant.

_____

Appeal from the United States District Court for the Western
District of Virginia, at Harrisonburg.  Michael F. Urbanski,
District Judge.  (5:11-cr-00005-MFU-1)

_____

Argued:  October 31, 2014          Decided:  January 6, 2015

_____

Before DUNCAN, WYNN, and DIAZ, Circuit Judges.

_____

Affirmed by unpublished opinion.  Judge Wynn wrote the opinion,
in which Judge Duncan and Judge Diaz joined.

_____

**ARGUED**: Aaron Lee Cook, AARON L. COOK, PC, Harrisonburg,
Virginia, for Appellant.  Jeb Thomas Terrien, OFFICE OF THE
UNITED STATES ATTORNEY, Harrisonburg, Virginia, for Appellee.
**ON BRIEF**: Timothy J. Heaphy, United States Attorney, OFFICE OF
THE UNITED STATES ATTORNEY, Harrisonburg, Virginia, for
Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

Bach Tran appeals her jury conviction on 139 counts of trafficking in contraband cigarettes and money laundering. Tran contends that the district court erred by: (1) denying her motion to suppress statements she made to federal agents while under custody; and (2) denying her Fed. R. Crim. P. 29 motion for judgment of acquittal. Finding no error, we affirm.

I.

Tran arrived in the United States as an immigrant from Vietnam in the early 1970s. After working in a bank as a teller and in the human resources department, Tran opened Armel Country Store in Winchester, Virginia, which she owned at the time of her arrest. Although the Armel store ostensibly functioned as a convenience store, the front doors were often chained shut during business hours, and its interior was dimly lit. Dust and expired product filled the shelves.

In 2008, federal agents with the Bureau of Alcohol, Tobacco, and Firearms ("ATF") commenced an undercover investigation in response to trafficking in contraband cigarettes. As part of its operation, ATF set up a fake cigarette wholesaler, Valley Tobacco, which distributed cigarettes to suppliers in the Winchester, Virginia area.

2

Tran's high-volume cigarette sales out of her small, run-down store attracted Valley Tobacco's attention.

On January 15, 2009, an undercover agent, acting on a tip, approached Tran at her store and offered to sell her large quantities of cigarettes. She promptly ordered 570 cartons of stamped (taxed) cigarettes[1] and arranged for further deliveries. On January 29, while making another delivery, the agent offered to sell Tran unstamped (untaxed) cigarettes. The agent told Tran that all transactions would be in cash. By purchasing unstamped cigarettes, Tran would save $2 to $3 per carton, the cost of the Virginia Tax. On February 26, the agent made the first delivery of unstamped cigarettes.

Over the following eighteen months, Tran purchased approximately 140,000 cartons of untaxed cigarettes from undercover agents, paying nearly $3.5 million in forty-five separate transactions. She also purchased counterfeit Virginia tax stamps to place on unstamped cigarettes she had received from other sources.

---

[1] Cigarette packets bear special stamps that indicate whether the proper state cigarette tax has been paid. Disparities in state cigarette taxes have resulted in an interstate black market in contraband cigarettes. Traffickers purchase cigarettes in states with a low cigarette tax and transport the cigarettes to high-tax states to be sold or, alternatively, sell unstamped cigarettes in states where tax stamps are required.

Tran functioned as a middleman in her cigarette operations and often spoke of her "special customers." J.A. 342, 345-46. In May of 2009 she told an agent that one of her special customers had been arrested for trafficking in cigarettes and thus was apprehensive about picking up large quantities at a time. Tran would become upset when the undercover agent did not deliver the agreed-upon amount of cigarettes because her special customer would not "come down" for a partial order. J.A. 354.

Tran spread her income across at least sixteen bank accounts and significantly underreported her gross sales. She also instructed an undercover agent on how to avoid filing currency transaction reports for large deposits that would draw unwanted attention.

Federal agents arrested Tran on November 2, 2011. Before interrogating her, the agents informed Tran of her rights under Miranda v. Arizona, 384 U.S. 436 (1966). As the agents were explaining her rights, Tran asked questions such as, "What is silent?," "What is a waiver?" and, "Is that I don't have to talk to you and then you punish me?" J.A. 96-109. The officers answered her questions, explained that Tran did not have to speak to them, and provided her with a written waiver form. The agents also repeatedly assured Tran that she would not be punished for choosing to remain silent.

4

At several points during the agents' exchange with Tran, she demonstrated some understanding of her rights. For instance, she said, "So I can be quiet[?]", to which an agent replied, "Yes." J.A. 104. When she asked, "So I don't have to talk to you?", the agent answered, "That is correct." J.A. 100. At one point, she remarked, "So I have a right to silence . . . ." J.A. 103. When she asked what would happen if she didn't talk, the agent explained, "[I]t just means that you don't want to talk to me, which is fine. . . . If I ask you a question and you don't want to answer the question, you don't have to. Okay? You're nodding your head up and down. Okay." J.A. at 101.

Eventually the agents decided that Tran in fact did understand her Miranda rights and had impliedly waived those rights by continuing to talk to them, so they commenced the interrogation. During the following two hours, Tran discussed her purchase of cigarettes, how she operated her business, and her employment as a bank employee. She appeared to have no trouble understanding the questions asked.

On February 17, 2011, a federal grand jury returned a 142-count indictment charging her with conspiracy to traffic in contraband cigarettes in violation of 18 U.S.C. § 371; trafficking in contraband cigarettes in violation of 18 U.S.C. § 2342(a); money laundering in violation of 18 U.S.C.

5

§ 1956(a)(1)(A)(i); money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and 1956(a)(1)(B)(ii); and money laundering in violation of 18 U.S.C. § 1957.

Before her trial, Tran filed a motion to suppress the statements obtained during her interrogation, contending that her Miranda waiver was not voluntary, knowing, or intelligent because of her "limited English proficiency and lack of familiarity with the criminal justice system." J.A. 64-65. The district court denied the motion.

At the close of her trial—during which Tran testified without the aid of an interpreter—the jury returned guilty verdicts on 139 of the 142 charged counts. Tran filed a motion for acquittal based on her entrapment defense, which the district court also denied. Tran then timely appealed.

II.

Tran first argues that the district court erred in denying her motion to suppress because her waiver of her Miranda rights was not knowing and intelligent. In reviewing a district court's denial of a motion to suppress, we examine factual findings for clear error and consider legal conclusions de novo. United States v. McGee, 736 F.3d 263, 269 (4th Cir. 2013). Further, when the district court denies a defendant's motion to suppress, the evidence is viewed "in the light most favorable to

6

the Government." United States v. Green, 599 F.3d 360, 375 (4th Cir. 2010).

In Miranda, the Supreme Court held that, once in custody, an individual may not be subject to interrogation until she is informed of her right to remain silent and her right to an attorney. 384 U.S. at 444. "Once the proper warnings have been given, the suspect 'may knowingly and intelligently waive [her] rights and agree to answer questions or make a statement.'" United States v. Dire, 680 F.3d 446, 469-70 (4th Cir. 2012) (quoting Miranda, 384 U.S. at 479). The waiver may be express or implied. See Berghuis v. Thompkins, 560 U.S. 370, 384 (2010).

To be effective, a waiver "must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception." United States v. Cristobal, 293 F.3d 134, 139-40 (4th Cir. 2002) (internal quotation marks and citation omitted). In addition, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. The government must establish, "by a preponderance of the evidence, that the defendant's waiver of his Miranda rights was knowing and voluntary." United States v. Robinson, 404 F.3d 850, 860 (4th Cir. 2005).

In considering Tran's motion to suppress, the district court reviewed the written transcript of Tran's interrogation, listened to the audio recording of the interview, and viewed a video file.  The court recognized that Tran appeared from the interview transcript to have had difficulty understanding the agents, but found that the audio recording heard in its entirety "paints a different picture."  J.A. 230.

We agree. In determining whether Tran's <u>Miranda</u> waiver was knowing and intelligent, we must look to "the totality of the circumstances surrounding the interrogation, including [Tran's] intelligence and education, age and familiarity with the criminal justice system, and the proximity of the waiver to the giving of the <u>Miranda</u> warnings."  <u>Dire</u>, 680 F.3d at 474 (internal quotation marks and citation omitted).

Considering the totality of the circumstances, we conclude that Tran's waiver was knowing and intelligent.  At several stages of the interview Tran indicated that she understood she was under no obligation to speak.  J.A. 100 ("So I don't have to talk to you?"), 104 ("So I can be quiet."), 103 ("So I have a right to silence . . . .").  We also agree with the district court that Tran's professional experience in the banking industry, her experience as a business owner, and her ability to communicate with the agents throughout her interrogation indicate that she understood her rights when they were (quite

8

thoroughly) explained to her. We further note that Tran appears to have had no difficulty testifying at great length at her trial without the aid of an interpreter. We therefore affirm the district court's denial of Tran's motion to suppress.

III.

Tran next argues that the district court erred in denying her motion for judgment of acquittal. She contends that the government failed to introduce sufficient evidence to overcome her entrapment defense. "We review de novo a district court's denial of a [Federal Rules of Criminal Procedure] Rule 29 motion for judgment of acquittal." United States v. Alerre, 430 F.3d 681, 693 (4th Cir. 2005). This Court will uphold a jury's verdict if, "viewing the evidence in the light most favorable to the Government, it is supported by 'substantial evidence.'" Id. (quoting United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). Substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Burgos, 94 F.3d at 862.

The affirmative defense of entrapment recognizes that, while the government may provide the opportunity to commit a crime for those predisposed to do so, it may not "implant in an innocent person's mind the disposition to commit a criminal act,

9

and then induce commission of the crime so that the Government may prosecute." Jacobson v. United States, 503 U.S. 540, 548 (1992)). The defense has two parts: (1) "government inducement," and (2) "a lack of predisposition on the part of the defendant to engage in criminal conduct." Mathews v. United States, 485 U.S. 58, 63 (1988). If a defendant presents evidence that she was induced to commit the crime, the burden shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime. United States v. Jones, 976 F.2d 176, 179 (4th Cir. 1992).

The government may meet this burden by showing that the defendant readily responded to an undercover agent's inducement. Id. Indeed, "it is sufficient to show that 'the defendant is of a frame of mind such that, once his attention is called to the criminal opportunity, his decision to commit the crime is the product of his own preference and not the product of government persuasion.'" Id. at 179-80 (quoting United States v. Osborne, 935 F.2d 32, 38 (4th Cir. 1991)). Further, to make its case, the government may ask the jury to consider actions that took place both before and after the defendant was contacted by the government. See United States v. Squillacote, 221 F.3d 542, 566 (4th Cir. 2000) (rejecting a jury instruction forbidding jurors from considering actions that occurred after the defendant was

10

contacted by the government in determining whether the defendant was predisposed to commit the crime).

We have held that where "the issue of entrapment is submitted to the jury, the jury's finding of guilt comprehends a finding of no entrapment." Jones, 976 F.2d at 180. As a result, "[we] may overturn this determination only if no rational trier of fact could have found predisposition beyond a reasonable doubt, viewing the evidence in the light most favorable to the prosecution." Id.

The district court concluded that the government had introduced sufficient evidence such that a rational jury could conclude that Tran was predisposed to traffic in cigarettes. Specifically, the district court pointed to the speed with which Tran responded to the government's overtures, the large-scale purchases she had been making prior to meeting the agents, and the illegitimate nature of her convenience store business.

On appeal, Tran focuses on the government's failure to introduce evidence that she trafficked in contraband cigarettes before being approached federal agents. However, the government did not need to do so to meet its burden. Tran's ready willingness to engage in that conduct was sufficient, and that, the government showed. Agents did not have to pressure Tran into purchasing unstamped cigarettes. As early as January 29, 2009, just two weeks after Tran's first encounter with the

11

agents, Tran expressed interest in purchasing unstamped cigarettes at a discounted price and made clear that the purchases would be for special customers. Over the following eighteen months, Tran purchased approximately 140,000 cartons of contraband cigarettes from undercover agents in approximately forty-five separate transactions, operating as the middleman for other traffickers. Tran sold large quantities of cigarettes even though her convenience store appeared to be seldom open for business.

Tran nevertheless argues that her conversations with federal agents during the early stages of the operation revealed that she did not understand her conduct to be illegal. When Tran asked her ATF contact, "We aren't doing anything illegal, are we?," the agent responded, "No, except for the tax stamps." J.A. 518. While this exchange may constitute some evidence of Tran's desire not to break the law, the agents advised Tran on "numerous occasions" that her conduct was illegal and that "we don't want to get caught." J.A. 518. Moreover, Tran's awareness or lack of awareness of the criminality of trafficking in untaxed cigarettes is immaterial to whether she was predisposed to commit that offense. See Jones, 976 F.2d at 180 ("The core issue raised by the entrapment defense is whether the defendant was predisposed to conduct which is criminal, regardless of whether the defendant appreciated its criminality

12

. . . ."). A reasonable jury could have found that Tran's ready acceptance of the agent's offers and her subsequent decision to repeatedly engage in large-scale purchases of unstamped cigarettes was a "product of h[er] own preference and not the product of government persuasion." Id. at 179-80.

We therefore conclude that the government produced substantial evidence such that a rational factfinder could have found predisposition beyond a reasonable doubt.

IV.

For the foregoing reasons the district court's denial of Tran's motion to suppress and denial of Tran's motion for acquittal are

AFFIRMED.

13